MATT GONZALEZ (SBN 153486)
G. WHITNEY LEIGH (SBN 153457)
744 Montgomery Street, Fifth Floor
San Francisco, CA 94111
Telephone: (415) 912-5950
Facsimile: (415) 912-5951
mgonzalez@gonzalezleigh.com
wleigh@gonzalezleigh.com

JAMES R. WHEATON (SBN 115230)
DAVID A. GREENE (SBN 160107)
GEOFFREY W. KING (SBN 267438)
1736 Franklin Street, Ninth Floor
Oakland, CA 94612
Telephone: (510) 208-7744
Facsimile: (510) 208-4562
wheaton@thefirstamendment.org
dgreene@thefirstamendment.org
gking@thefirstamendment.org

Attorneys for Plaintiff
DAVID MORSE

FILED
2010 DEC -9 P 3 00
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

DMR

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

DAVID MORSE,

        Plaintiff,

v.

REGENTS OF THE UNIVERSITY OF
CALIFORNIA, BERKELEY;
UNIVERSITY OF CALIFORNIA AT
BERKELEY POLICE DEPARTMENT;
UNIVERSITY OF CALIFORNIA AT
BERKELEY POLICE CHIEF MITCHELL
J. CELAYA III; UNIVERSITY OF
CALIFORNIA AT BERKELEY POLICE
OFFICER DETECTIVE NICOLE
MILLER; UNIVERSITY OF
CALIFORNIA AT BERKELEY POLICE
OFFICER DETECTIVE REICH;
UNIVERSITY OF CALIFORNIA AT
BERKELEY POLICE OFFICER
SERGEANT HARRIS; UNIVERSITY OF
CALIFORNIA AT BERKELEY POLICE
OFFICER WYCKOFF; UNIVERSITY OF
CALIFORNIA AT BERKELEY POLICE
OFFICER MANCHESTER; CITY OF
BERKELEY POLICE DEPARTMENT;
CITY OF BERKELEY POLICE CHIEF

Case No. **CV 10 5594**

**COMPLAINT FOR
INJUNCTIVE AND
DECLARATORY RELIEF
AND FOR DAMAGES**

**DEMAND FOR JURY TRIAL**

Date: _____
Time: _____
Judge: _____

1

MICHAEL K. MEEHAN; COUNTY OF
ALAMEDA; ALAMEDA COUNTY
SHERIFF'S DEPARTMENT; ALAMEDA
COUNTY SHERIFF GREGORY J.
AHERN; and DOES 1-25,

Defendants.

## PRELIMINARY STATEMENT

1.     Veteran journalist David Morse has covered hundreds of demonstrations and other public events over the course of his career, many of them contentious protests with large police presences. For years, Morse had engaged in this work without major incident. But on December 11, 2009, as Morse covered a demonstration against budget cuts at UC Berkeley, campus police officers targeted Morse as he made news photographs following acts of vandalism by some in the crowd. As Morse's arresting officer put it as he exited his police car, "I saw you take a picture of us. We want your camera. We believe your camera contains evidence of a crime."

2.     Officers allowed the demonstrators, many of whom were masked, to flee from the scene. They then arrested and searched Morse instead. When Morse protested that he was a journalist and that he had done nothing wrong, the police simply told him, "You're not a lawyer, so shut the fuck up."

3.     At no point did Morse participate in the demonstration. Morse identified himself as a journalist *six times* prior to being put into general population at Santa Rita Jail. Morse provided his press pass to multiple officers, including a sergeant. Nonetheless, officers jailed Morse and later increased his charges for the sole purpose of securing a search warrant for his unpublished news photographs. That search warrant was illegal under both California and federal law; it only issued because the affidavit supporting it omitted any reference to Morse's newsgathering activities.

4.     All of Morse's charges were dropped at his initial appearance. The search warrant has since been quashed under a state law protecting unpublished journalistic materials.

5.     By this Complaint, Morse seeks the following relief: (1) to obtain compensation for Defendants' violations of his First, Fourth, and Eighth Amendment rights; (2) to obtain

COMPLAINT FOR INJUNCTIVE, DECLARATORY RELIEF AND DAMAGES

1   compensation for Defendants' violations of his rights under the Privacy Protection Act, which

2   for three decades has prohibited the search and seizure of unpublished journalistic materials;

3   (3) to regain control over any unpublished journalistic materials still in Defendants' possession

4   or control; and (4) to ensure that Defendants undertake training to prevent such abuses from

5   happening in the future.

6                                              **JURISDICTION**

7          6.     This case arises under the United States Constitution, under Title 42 of the

8   United States Code § 1983 (civil rights action) and § 2000aa et seq. (Privacy Protection Act),

9   and under Title 28 of the United States Code §§ 2201 and 2202 (declaratory relief).

10         7.     This Court has jurisdiction under 28 U.S.C. §§ 1331 (federal question), 1343

11  (civil rights), and 2201 (declaratory relief); and 42 U.S.C. § 2000aa-6(h) (Privacy Protection

12  Act).

13                          **INTRADISTRICT ASSIGNMENT AND VENUE**

14         8.     The unlawful acts alleged herein occurred in the County of Alameda, California,

15  which is within this judicial district. Venue is proper in this district under 28 U.S.C. §§ 1391(b)

16  and (e) and assignment to either the San Francisco or Oakland Division is proper pursuant to

17  Local Rule 3-2(d).

18         9.     Plaintiff has complied with the California Government Torts Claims Act section

19  910 et seq. by filing a government claim within six months of the violations alleged herein.

20                                               **PARTIES**

21         10.    Plaintiff DAVID MORSE is an experienced journalist and a resident of

22  Oakland, California.

23         11.    Defendant REGENTS OF THE UNIVERSITY OF CALIFORNIA AT

24  BERKELEY ("Regents") is a public corporation and agency of the State of California with the

25  power to sue and be sued. Defendant Regents officially employs all University of California

26  personnel, including the officers of the University of California at Berkeley Police Department

27  ("UCPD"). Defendant Regents is sued in its official capacity only.

28

COMPLAINT FOR INJUNCTIVE, DECLARATORY RELIEF AND DAMAGES                                    3

12.     Defendant UCPD is an agency primarily responsible for the enforcement of law within the campus of the University of California at Berkeley and an area within one mile of the exterior boundaries of the campus. Defendant UCPD employs Defendants Chief Mitchell J. Celaya III, Detective Nicole Miller, Detective Reich, Sergeant Harris, Officer Wyckoff, Officer Crista Manchester and Doe UCPD officers. Defendant UCPD is sued in its official capacity only.

13.     Defendant MITCHELL J. CELAYA III is responsible for the operations, practices, and customs of UCPD. Defendant Celaya is also responsible for the hiring, screening, training, retention, supervision, discipline, counseling and control of the officers under his supervision and command. At all relevant times, Defendant Celaya was acting under color of law and in the course and scope of his employment. He is sued in his individual and official capacities.

14.     Defendant UCPD DETECTIVE NICOLE MILLER is a UCPD police officer. She submitted a "statement of probable cause" affidavit which UCPD and the Alameda County Sheriff's Department ("ACSD") used to obtain the search warrant for Morse's property. The search warrant included knowing misrepresentations and omissions of material facts. Defendant Miller participated in and/or acted jointly with others and/or authorized the use of Morse's photographs to solicit the identification of, identify, charge and/or punish individuals in connection with the December 11, 2009 demonstration without his permission. At all relevant times, Detective Miller acted under color of law and in the course of her employment with UCPD. She is sued in her individual and official capacities.

15.     Defendant UCPD SERGEANT HARRIS is a UCPD police officer. Defendant Harris participated in the unlawful detention and seizure of Morse and his property. At all relevant times, Defendant Harris acted under color of law and in the course and scope of his employment with UCPD. He is sued in his individual and official capacities.

16.     Defendant UCPD DETECTIVE REICH is a UCPD police officer. At all relevant times, Defendant Reich acted under color of law and in the course and scope of his employment with UCPD. Detective Reich was involved in the detention of Morse's belongings

1   and, Plaintiff alleges, assisted or conspired in, or ratified, the securing of the search warrant.

2   She or he is sued in her or his individual and official capacities.

3        17.    Defendant UCPD OFFICER WYCKOFF is a UCPD police officer. Defendant

4   Wyckoff participated in the unlawful detention and seizure of Morse and his property.

5   Defendant Wyckoff also used excessive force in this detention of Morse. At all relevant times,

6   Defendant Wyckoff acted under color of law and in the course and scope of his employment

7   with UCPD. He is sued in his individual and official capacities.

8        18.    Defendant UCPD OFFICER CRISTA MANCHESTER is a UCPD police

9   officer. Defendant Manchester participated in the unlawful detention and seizure of Morse and

10   his property. At all relevant times, Defendant Manchester acted under color of law and in the

11   course and scope of her employment with UCPD. UCPD OFFICER MANCHESTER is sued in

12   her individual and official capacities.

13        19.    Defendant CITY OF BERKELEY POLICE DEPARTMENT ("BPD") is an

14   agency responsible for the enforcement of law within the City of Berkeley. It employs

15   Defendant Michael K. Meehan and Doe BPD officers.

16        20.    Defendant BPD CHIEF MICHAEL K. MEEHAN is responsible for the

17   operations, practices, and customs of BPD. Defendant Meehan is also responsible for the

18   hiring, screening, training, retention, supervision, discipline, counseling and control of the

19   officers under his supervision and command. At all relevant times, Defendant Meehan was

20   acting under color of law and in the course and scope of his employment. He is sued in his

21   individual and official capacities.

22        21.    Defendant COUNTY OF ALAMEDA ("County") is a political subdivision of

23   the State of California that can sue and be sued in its own name. Defendant County of Alameda

24   includes, operates, governs, and is responsible for the Santa Rita Jail and Alameda County

25   Sheriff's Department pursuant to the laws of the State of California and Alameda County.

26        22.    Defendant Alameda County Sheriff's Department ("ACSD") is an agency

27   responsible for law enforcement in the County of Alameda, State of California. It employs

28   Defendant Gregory J. Ahern and Doe sheriff's deputies.

1    23.    Defendant ACSD SHERIFF GREGORY J. AHERN is Sheriff-Coroner of the

2    Alameda County Sheriff's Department. The Sheriff acts as an Officer of the Courts and is

3    charged with the responsibility of keeping the peace and apprehending persons charged with

4    crimes in the unincorporated areas of Alameda County. He is responsible for the policies,

5    practices, and customs of ACSD. Defendant Ahern is also responsible for the hiring, screening,

6    training, retention, supervision, discipline, counseling and control of the deputy sheriffs under

7    his supervision and command. At all relevant times, Defendant Ahern was acting under color

8    of law and in the course and scope of his employment with Alameda County. He is sued in his

9    individual and official capacities.

10    24.    DOES, on information and belief, are each responsible in some manner for the

11    injuries and damages sustained by Plaintiff as set forth herein. Plaintiff is further informed and

12    believes and on this belief alleges that at all material times these Defendants owned, operated,

13    managed, directed, controlled, and/or employed other defendants in this action. The true names

14    and capacities of these Defendants are unknown to Plaintiff, who therefore sues said

15    Defendants by such fictitious names, and Plaintiff will seek leave to amend this complaint to

16    show their true names and capacities when the same are ascertained.

17    25.    This complaint may be pled in the alternative pursuant to FRCP 8(d).

18                                **FACTUAL ALLEGATIONS**

19    26.    Plaintiff re-alleges each and every paragraph in this Complaint as if fully set

20    forth here.

21    27.    Plaintiff DAVID MORSE is a 42-year old veteran photojournalist. He has been

22    a member of the *San Francisco Bay Area Independent Media Center,* or *Indybay,* since May

23    2004.

24    28.    *Indybay* is an online newspaper, press association and wire service that

25    generates and distributes edited audio, visual and print stories of local events for media outlets

26    around the world and the general public. *Indybay* is associated with more than 150 *Indymedia*

27    outlets worldwide, including sixty within the United States. The website receives between

28    20,000-30,000 page views on any given day. *Indybay* stories are syndicated by Google News.

1    *Indybay* previously published a print periodical, *Fault Lines*, between June 2004 and June

2    2007.

3          29.     David Morse began his journalism career with a monthly column in a music

4    magazine in 1991. Since late 2002, he has focused his work on the documentation of social and

5    political movements. Although Morse has covered hundreds of demonstrations and other

6    public events, and while his reportage often requires him to attend contentious protests with

7    large police presences, Morse had avoided any serious incident with the police prior to

8    December 11, 2009.[1]

9          30.     Morse is one of approximately a dozen members of the *Indybay* collective, a

10   position he has held since May 2004. Morse holds a current *Indybay* press pass and has

11   consistently published stories and photographs to *Indybay* since March 2004. He variously

12   reports and edits for *Indybay* anywhere from twenty to forty hours a week.

13         31.     Morse's reportage has been published by mass and independent media outlets

14   alike. For example, Morse has licensed protest footage to ABC/Disney, and Morse's

15   documentation of the demonstrations over the January 1, 2009 shooting of Oscar Grant at the

16   Fruitvale BART station has been used in dozens of articles in the *San Francisco Bay View*

17   newspaper.

18                              **Events of December 11-12, 2009**

19         32.     On December 11, 2009, Morse planned to cover an off-campus concert at UC

20   Berkeley for *Indybay*. Morse had been covering student protests at the UC Berkeley campus on

21   November 20, December 7 and December 9, 2009 and at San Francisco State University on

22   December 9 and 10, 2009. Morse published stories on all of these demonstrations to *Indybay*.

23

24   _____

25   [1] Until December 11, 2009, Morse had been detained by police only twice while covering a
     demonstration. In these instances, each of which occurred at a large protest, police briefly
26   detained hundreds of members of the press and public who happened to be in the area at the
     time. In the first incident, Morse was cited and released, and the ticket was later dismissed. In the
27   second incident, Morse was released without citation or charge.

28

33.     Morse arrived too late to attend the concert. However, upon arriving at the venue at approximately 11:00 p.m., he encountered a group of approximately one hundred people leaving the concert venue and chanting in what appeared to be a political march like the many he had covered previously. Taking his camera, his backpack, and his press pass, Morse caught up with the demonstrators and began photographing them.

34.     Morse had four blank memory discs in his backpack and one disc in his camera.

35.     The demonstrators marched to a building. One masked demonstrator ascended the steps of the building and threw a large plastic garbage can at the front door, to no effect. Others caused damage to planters and light fixtures around the building. Morse followed the demonstrators up the steps of the building and made news photographs. Morse was later informed that this building was the UC Berkeley Chancellor's house, although he did not know this at the time.

36.     A UCPD police car approached the scene, with siren on and lights flashing, and the demonstrators began to run away. Morse continued making news photographs as the police car approached. Morse made a flash photograph of the police car as it came to a path that ran past the bottom of the stairs, and walked down the stairs calmly to the edge of the path to document any arrests that might occur.

37.     At no time did Morse participate in the demonstration. He was present solely to gather news.

38.     Rather than pursue the fleeing demonstrators, many of whom had their faces covered, the police car pulled up directly in front of Morse. UCPD officers Manchester and Wyckoff exited the vehicle and briskly approached Morse. As they approached, Officer Wyckoff shouted: "I saw you take a picture of us. We want your camera. We believe your camera contains evidence of a crime."

39.     Immediately after Officer Wyckoff shouted to Morse, Morse informed Officers Wyckoff and Manchester that he was a journalist, that he could show them his press pass, and that they should not take his camera. Officers Manchester and Wyckoff refused to look at Morse's press pass. Instead they informed Morse that he was being detained and ordered him

1  to stand face-forward against the police car. Morse complied, and Officer Manchester

2  confiscated Morse's backpack and camera. Officer Wyckoff then pulled Morse's arms behind

3  his back and told him to stop resisting, even though Morse was complying fully. Officer

4  Wyckoff frisked Morse for weapons, handcuffed him with excessively tight handcuffs, and

5  placed him in the back of the police car.

6      40.     After approximately thirty minutes, Morse's thumbs began to go numb due to

7  the excessively tight handcuffs. Morse called out to the officers, who took Morse out of the

8  parked police car and loosened the handcuffs somewhat.

9      41.     At this point, Morse for a second time informed Officer Wyckoff that he was a

10  journalist. Officer Wyckoff again ignored Morse and again placed him back inside the police

11  car. When Morse suggested that the police would not detain him and take his camera if they

12  saw a KTVU logo on it, Officer Wyckoff replied: "We've done it to them, too," and shut the

13  police car door.

14      42.     Approximately one hour after Morse was initially detained, Officer Wyckoff

15  took Morse out of the car and searched him more thoroughly. At this point, Officer Wyckoff

16  removed Morse's press pass from his back pocket. Morse urged Officer Wyckoff to examine

17  the press pass, which was an expired pass that Morse carries as a backup to his bulkier current

18  pass when he does not anticipate that an event will feature a large police presence.

19      43.     Morse again informed Officer Wyckoff and the other officers present that he

20  was a journalist.

21      44.     Officer Wyckoff examined the press pass, as did several other officers,

22  including Sergeant Harris, who had arrived on scene. Officer Wyckoff then returned the press

23  pass to Morse's pocket without comment.

24      45.     At no point was Morse asked about or allowed to explain why he was not

25  carrying his most current press pass.

26      46.     A true and correct copy of Morse's current press pass is attached hereto as

27  Exhibit A. A true and correct copy of the backup press pass that he had with him on December

28  11, 2009 is attached hereto as Exhibit B.

47.     At this point, Officer Wyckoff also confiscated Morse's cell phone, which had been in the side pocket of his pants. Officer Wyckoff did this without Morse's knowledge. After this second search, Morse asked whether anything had been taken from his pockets that had not been returned. Officer Wyckoff replied, "No." Morse did not regain possession of his phone until it was returned to him upon his release from jail. Morse believes and on this belief alleges that his cell phone was subjected to a warrantless search by UCPD, BPD and/or ACSD officers.

48.     Defendants knew or reasonably should have known at the time of Morse's seizure that the materials on Morse's mobile phone were possessed in connection with a purpose to disseminate to the public a newspaper, book, broadcast or other similar form of public communication.

49.     Morse explained to the officers that he did not think it was legal for them to detain him and seize his camera. Officer Wyckoff responded by saying: "You're not a lawyer, so shut the fuck up," and placed Morse back inside the police car.

50.     Approximately two hours after Morse was initially detained, Officer Wyckoff informed Morse that he was being arrested for "riot and vandalism." Morse for a fourth time informed Officer Wyckoff that he was a journalist and present at the demonstration only for the purposes of documenting it for journalistic purposes. Officer Wyckoff ignored Morse's statements, however, and searched him again.

51.     Officer Wyckoff then told Morse that he had Morse's cell phone from the second search and hour earlier and that he would give it to Berkeley Police officers for transport. Officer Wyckoff also told Morse that his backpack was too big to take to jail and that it would be retained by UCPD.

52.     Morse was then taken to Santa Rita jail, where he was booked on riot and vandalism charges.

53.     Officer Wyckoff processed Morse at the Santa Rita jail, which is maintained and run by ACSD, ACSD Sheriff Gregory Ahern, and other ACSD deputies whose identities are unknown to Morse at this time.

54.     As Morse was being processed into the Santa Rita jail, Officer Wyckoff interrogated him. Morse informed Officer Wyckoff for a fifth time that he was a journalist, that he was present at the demonstration solely in the capacity as a journalist attempting to cover a political demonstration, and that he had not done anything wrong. Officer Wyckoff responded by saying that this did not matter.

55.     Officer Wyckoff then asked Morse to sign a declaration that included an admission that Morse had been uncooperative. Morse refused to sign the statement and again said that he believed his arrest and the confiscation of his camera were wrongful due to his status as a journalist and the fact that he had been covering the demonstration in that capacity. Officer Wyckoff, visibly angered, crumpled the declaration and threw it away.

56.     Morse was then placed into the general population of the Santa Rita jail by ACSD officers whose identities are unknown to Morse at this time.

57.     Morse was forced to spend the night and all the next morning in jail. At approximately noon the next day, December 12, 2009, ACSD officers whose identities are unknown to Morse at this time told him that he had made bail on the initial charges. He was taken to a small, unlocked waiting room to be processed out of jail.

58.     Morse waited in the waiting room for forty-five minutes. An ACSD officer whose identity is unknown to Morse at this time then informed Morse via a loudspeaker that he faced additional charges and that his bail had been increased. Morse was then returned to general population. Morse believes and on this belief alleges that his bail and charges were increased solely for the purpose to allow time for a search warrant to be obtained to search his camera and discs and seize his unpublished news photographs.

59.     Morse was released later that evening after his mother posted bond on his $132,500 bail. Morse later learned that the new charges against him included attempted arson of an inhabited structure, vandalism, participation in a riot, attempted burglary, threatening a university official and two counts of assault with a deadly weapon against an officer.

**The Issuance of the Search Warrant**

60.     UCPD and ACSD obtained a search warrant for Morse's unpublished news photographs approximately one hour before Morse made bail for the second time. The search warrant was based on a "statement of probable cause" affidavit by UCPD Detective Nicole Miller. Detective Miller shared custody of Morse's property with Detective Reich. Plaintiff believes, and upon that belief alleges, that Detective Reich assisted or conspired in, or ratified, Detective Miller's securing of the search warrant.

61.     The affidavit submitted by Detective Miller states that "individuals that take part in demonstrations and protests regularly take photographs and videos of their events. The photographs ad [sic] videos are often later posted to internet websites or used to promote future events." The affidavit makes no mention of the fact that Morse is a journalist; that he repeatedly informed officers of this fact; that he offered to show his press pass to them; that they found his press pass; or that multiple officers, including a sergeant, reviewed his press pass. The affidavit also exaggerates Morse's conduct at the scene by describing him as "running" when he was not. This latter fact conflicts with UCPD's own incident report.

62.     A true and correct copy of the search warrant is attached hereto as Exhibit C. A true and correct copy of the supporting affidavit and Statement of Probable Cause is attached hereto as Exhibit D. A true and correct copy of UCPD incident report is attached hereto as Exhibit E.

63.     Morse believes and on this belief alleges that Defendants seized and searched his materials not only to identify and/or punish individuals in connection with the events of December 11, but also to control the narrative about what had transpired that night and to deter his future reporting by intentionally interfering with his rights to newsgather and to publish his work.

///

///

///

COMPLAINT FOR INJUNCTIVE, DECLARATORY RELIEF AND DAMAGES

12

1    64.    The Superior Court of California, County of Alameda issued the search warrant

2  at 6:40 p.m. on December 12, 2009. The warrant authorized the search of Morse's camera and

3  two CD-R discs and the seizure of "photographs . . . and any or all electronically stored data."

4  The supporting affidavit and Statement of Probable Cause were signed by UCPD Detective

5  Nicole Miller.

6    65.    Although the search warrant UCPD and ACSD obtained authorized a search of

7  two of Morse's discs, UCPD seized five discs from Morse, refused to return four blank discs

8  and his camera for nearly two weeks, and thereafter refused to return the one disc that

9  contained Morse's unpublished photographs. Morse believes and on this belief alleges that

10  UCPD searched all five of his memory discs in order to assess which one contained

11  photographs from the December 11 protest.

12    66.    Defendants knew or reasonably should have known at the time of Morse's

13  seizure that the materials on his memory discs were possessed in connection with a purpose to

14  disseminate to the public a newspaper, book, broadcast or other similar form of public

15  communication.

16    67.    All charges against Morse were dropped at his initial appearance on Tuesday,

17  December 15, 2009.

18    68.    Due to a seven-day "stay away" order UCPD had served on Morse shortly

19  before he was transported to jail, Morse waited one week before traveling to UCPD's offices at

20  UC Berkeley in an attempt to retrieve his confiscated property. There, Morse was met by

21  Detective Miller, who took him into a small room that housed his backpack and attempted to

22  question him. Morse reiterated his status as a journalist and told Detective Miller that UCPD

23  officers' past and present conduct toward him were wrongful.

24    69.    Detective Miller then returned Morse's backpack to him. The backpack had

25  clearly been searched, as items were in different pockets than when the backpack had been

26  seized. When Morse inquired as to why, Detective Miller told him that his bag had been

27  searched for contraband. Detective Miller did not indicate when that search had occurred.

28

COMPLAINT FOR INJUNCTIVE, DECLARATORY RELIEF AND DAMAGES                                    13

1       70.     None of Morse's discs were in his backpack. When Morse asked for them,

2  Detective Miller declined to provide them at that time. Morse then left the police station with

3  his backpack.

4       71.     Over the course of the following several days, Morse repeatedly called

5  Detective Miller regarding his five memory discs and camera. Nearly two weeks after Morse's

6  arrest, Detective Miller told Morse that he could retrieve his camera and discs. Detective Miller

7  did not specify how many discs would be returned to Morse.

8       72.     Morse again traveled to UCPD's offices and retrieved his camera and a bag

9  containing what he believed to be all of the memory discs that had been seized from him on

10  December 11, 2009. There was one disc in the camera, which Morse presumed to be the disc

11  that he had been using to record news photographs. As Morse left the police station, a man who

12  Morse believes was a plainclothes officer ran out of the station after him. When Morse noticed

13  the man, who was carrying a camera with a long lens, the man stopped, averted his eyes and

14  began taking photographs of objects other than Morse.

15       73.     Morse then went to his parked car, sat down and used his camera to review the

16  memory discs returned to him by UCPD. It was at this point that Morse realized that only four

17  discs had been returned to him, all of them blank. This included a blank disc UCPD had placed

18  inside the camera after removing the disc containing Morse's news photographs.

19       74.     Morse then looked up and saw the same man who had hurriedly exited the

20  police station standing across the street from Morse's car. The man was pointing his camera

21  lens at Morse. It appeared to Morse that the man was making surveillance photographs of

22  Morse and/or his car.

23       75.     Morse then drove home and called Detective Miller to inquire about the missing

24  disc and to demand its return. Detective Miller told Morse that it would not be returned to him

25  at that time.

26  ///

27  ///

28  ///

COMPLAINT FOR INJUNCTIVE, DECLARATORY RELIEF AND DAMAGES                    14

76.     Defendants refused to return the disc with Morse's photographs or copies of the seized photographs, despite repeated requests by Morse. Defendants provided a digital copy of Morse's photographs to him for the first time at a hearing on June 4, 2010, nearly six months after they were unlawfully seized.

77.     Morse's unpublished news photographs were posted on a web site maintained by UC Berkeley and/or UCPD on or about December 21, 2009. The website contained announcements to the public at large, asking that anyone who could identify the individuals in the photographs to come forward and identify them. Morse has never authorized Defendants Regents, UCPD, or any other agency or individual, or their officials, agents or employees, to use his photographs in this or any other manner. The website remained active until June 4, 2010.

78.     On June 28, 2010, Judge Yolanda Northridge of the Alameda County Superior Court quashed the search warrant as to Morse, ordered the return of all copies of his unpublished news photographs, and ordered that a declaration be filed with that court detailing to which persons or entities Morse's photographs had been distributed. This ruling was made pursuant to California Penal Code section 1524(g), which absolutely prohibits the issuance of a search warrant for unpublished news photographs.

79.     Defendants retained Morse's original disc containing his unpublished news photographs until June 30, 2010, when the disc was returned to Morse through his counsel. Defendants retained copies of at least some of Morse's unpublished news photographs until July 16, 2010.

80.     Morse made a final photograph before being detained. This photograph depicted an approaching UCPD police car. This photograph has never been returned to Morse. Morse believes and on this belief alleges that the photograph was destroyed or is being withheld intentionally to control the narrative of the events of December 11. Plaintiff continues to suffer irreparable injury through Defendants' failure to return this photograph.

81.     Defendants Celaya, Meehan, Ahern, UCPD, BPD and ACSD failed to properly screen, train and/or supervise their officers and deputies. Notably, Defendants Celaya and UCPD had actual notice of statutory protections for journalistic work product and unpublished documentary materials prior to Morse's arrest, as several ranking UCPD officers are presently defendants in litigation arising out of a 2008 raid of a Berkeley newspaper office that commenced in January 2009.[1]

## COUNT I

### VIOLATION OF THE FIRST AMENDMENT
### OF THE UNITED STATES CONSTITUTION

**Claim for Damages Against Defendants Miller, Reich, Harris, Wyckoff, Manchester, Celaya, Meehan, Ahern, BPD, ACSD and Does 1-25 in Their Individual Capacities**

**Claim for Equitable Relief Against All Defendants in Their Official Capacities**

82.     Plaintiff realleges and incorporates here the allegations in Paragraphs 1-81 above, as though fully set forth.

83.     Defendants' policies, practices and conduct in unlawfully arresting Morse; seizing his camera and memory discs; searching his phone; searching his memory discs; searching, seizing and retaining his unpublished news photographs; and unlawfully using those photographs to identify individuals; increasing Morse's bail and continuing to hold Morse were intended to, and did, interfere with Morse's newsgathering, halt publication of his images for nearly six months, and chill Morse from reporting in the future. Thus these policies, practices and conduct violate Plaintiff's free speech, press and associational rights guaranteed by the First Amendment.

---

[1] Northern District of California Case No. 09-00168-JSW (filed January 14, 2009). The named UCPD Defendants in that case include former UCPD Police Chief Victoria Harrison, Sergeant of Investigations Karen Alberts, Detective William Kasiske, Detective Wade MacAdam and Corporal Timothy J. Zuniga. All but Chief Harrison have been sued for violations of the Privacy Protection Act cited herein.

## COUNT II

### VIOLATION OF THE FOURTH AMENDMENT
### OF THE UNITED STATES CONSTITUTION

**Claim for Damages Against Defendants Miller, Reich, Harris, Wyckoff, Manchester, Celaya, Meehan, Ahern, BPD, ACSD and Does 1-25 in Their Individual Capacities**

**Claim for Equitable Relief Against Defendants Miller, Reich, Harris, Wyckoff, Manchester, Celaya, Meehan, BPD, ACSD and Does 1-25 in Their Official Capacities**

84.     Plaintiff realleges and incorporates here the allegations in Paragraphs 1-83 above, as though fully set forth.

85.     Defendants' policies, practices and conduct in seizing and arresting Morse without probable cause; subjecting him to excessive force; searching his person; seizing and searching his camera, memory discs and unpublished news photographs; seizing and searching his mobile phone; searching three of his memory discs without a warrant; searching his backpack without a warrant; increasing Morse's bail and continuing to hold Morse in custody violated his rights to be free from unreasonable search and seizure and excessive force as guaranteed by the Fourth Amendment.

## COUNT III

### VIOLATION OF THE EIGHTH AMENDMENT
### OF THE UNITED STATES CONSTITUTION

**Claim for Damages Against Defendants Miller, Reich, Harris, Wyckoff, Manchester, Celeya, Meehan, Ahern, BPD, ACSD and Does 1-25 in Their Individual Capacities**

**Claim for Equitable Relief Against All Defendants in Their Official Capacities**

86.     Plaintiff realleges and incorporates here the allegations in Paragraphs 1-85 above, as though fully set forth.

87.     Defendants' policies, practices and conduct in raising Morse's bail solely to keep him in custody for the purpose of securing the illegal search warrant were intended to and did violate Plaintiff's right to be free of excessive bail as guaranteed by the Eighth Amendment.

## COUNT IV

## PRIVACY PROTECTION ACT, 42 U.S.C. § 2000aa et seq.

### Claim for Damages Against Defendants Miller, Reich, Harris, Wyckoff, Manchester, Celaya, Meehan, Ahern, BPD, ACSD and Does 1-25 in Their Individual Capacities

88.     Plaintiff realleges and incorporates here the allegations in Paragraphs 1-87 above, as though fully set forth.

89.     Defendants' policies, practices and conduct in unlawfully seizing Morse's camera and memory discs; searching his memory discs; searching, seizing and retaining his unpublished news photographs; and seizing and searching his mobile phone violated Plaintiff's rights under the Privacy Protection Act, 42 U.S.C. § 2000aa et seq.

## COUNT V

## DECLARATORY RELIEF UNDER 28 U.S.C. §§ 2201, 2202

### Claim for Equitable Relief Against All Defendants In Their Official Capacities

90.     Plaintiff realleges and incorporates here the allegations in Paragraphs 1-89 above, as though fully set forth.  There exists an actual, present and justiciable controversy between Plaintiff and Defendants concerning their rights and duties with respect to Defendants' conduct described herein. Plaintiff contends that Defendants violated Plaintiff's rights under the Constitution and laws of the United States. On information and belief, Defendants deny that their conduct violated Plaintiff's rights under the Constitution and laws of the United States. Plaintiff fears that he is now and will again be subjected to such unlawful and unconstitutional actions, and seek a judicial declaration that Defendants' conduct deprived Plaintiff of his rights under the Constitution and laws of the United States.

91.     This controversy is ripe for judicial decision, and declaratory relief is necessary and appropriate so that the parties may know the legal obligations that govern their present and future conduct.

///

///

///

1

### PRAYER FOR RELIEF

2      WHEREFORE, Plaintiff seeks relief from this Court as follows:

3          a.      Issue a judicial declaration that Defendants' actions as alleged in this Complaint

4  violate the First, Fourth, and Eighth Amendments of the United States Constitution, and 42

5  U.S.C. § 42 U.S.C. 2000aa et seq.;

6          b.      Issue a court order requiring Defendants to undertake training and other

7  prophylactic measures to ensure defendants' acts are not repeated in future years;

8          c.      Issue a court order requiring defendants to return Morse's final photograph and

9  any other retained photographs to him;

10         d.      Award Plaintiff nominal, compensatory, special and statutory damages, in an

11 amount according to proof, and to the extent permitted by law;

12         e.      Award pre-judgment and post-judgment interest to the extent permitted by law;

13         f.      Award Plaintiff his costs and expenses, including reasonable attorneys' fees

14 under 42 U.S.C. § 1988 and 28 U.S.C. § 2412; and

15         g.      Award such other relief as is just and proper.

16

17

18

19

20

21

22

23

24

25

26 ///

27 ///

28 ///

COMPLAINT FOR INJUNCTIVE, DECLARATORY RELIEF AND DAMAGES                    19

1

## DEMAND FOR JURY TRIAL

2      In accordance with Fed. R. Civ. P. 38(b), and Northern District Local Rule 3-6(a),

3  Plaintiff hereby demands a jury trial for all issues triable by jury.

4      This claim is timely made, and is presently within jurisdictional time limits to present

5  claims.

6  Dated: December 9, 2010                    Respectfully submitted,

7                                             FIRST AMENDMENT PROJECT

8

9

10                                  By:

11                                       Geoffrey King (SBN 267438)

12                                       James R. Wheaton (SBN 115230)
                                         David A. Greene (SBN 160107)
13                                       FIRST AMENDMENT PROJECT

14

15                                       GONZALEZ AND LEIGH

16                                       G. Whitney Leigh (SBN 153457)
                                         Matt Gonzalez (SBN 153486)
17                                       Attorneys for Plaintiff DAVID MORSE

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR INJUNCTIVE, DECLARATORY RELIEF AND DAMAGES                          20

EXHIBIT A



The bearer of this card  is on assignment
for the SF Bay Independent Media Center.
Please extend to her or him all privileges
given to the Press.

EXHIBIT B



The bearer of this card is on assignment for the SF Bay Independent Media Center. Please extend to her or him all privileges given to the Press.

EXHIBIT C



**SUPERIOR COURT OF CALIFORNIA
COUNTY OF ALAMEDA**



## SEARCH WARRANT

THE PEOPLE OF THE STATE OF CALIFORNIA TO:     WARRANT NO. 2009 -2700

Any peace officer in Alameda County

The affidavit below, sworn to and subscribed before me, has established probable cause to believe that certain articles and property consisting of:

**Place(s) to be searched:**
1) Sony Digital Camera, model MVC-CD500, serial number 36459. Recovered from MORSE, David Bryan.(E98-1-1)
2) Two Memorex CD-R discs, 210 mb each. Recovered from MORSE, David Bryan. (E98-2-2)
3) Canon Powershot Digital Camera, model S5IS, serial number 6726216778, black in color. Recovered from LITMAN-CLEPER, Julia (E98-3-1)
4) Nikon CoolPix P50 Digital Camera, model P50, serial number 35429241, black in color. Recovered from JAMES, Carwil R. (E98-4-1)
5) Crucial Micro SD Media card, black in color. Recovered from backpack possessed by JAMES, Carwil R. (E98-5-1)
6) Samsung Flip Cell Phone, model SGH-A237, serial number RPMS 306307T, black in color. Unknown owner. Located on service road West of University House. (E116-1-1)

**Property to be seized:**
Photographs, videos, text messages, email addresses, telephone numbers, names and/or nicknames associated with telephone numbers, voicemail messages, "Phone Book" or "Contacts", dates, times, and telephone numbers of the recent call activity, any and or all electronically stored data.

Night service: [If initialed by judge} for good cause, night service is authorized:_____

**Disposition of property:** Any item seized during the lawful service of this Search Warrant shall be disposed in accordance with law by the University of California Police Department upon adjudication of the case. The officers serving this search warrant are also hereby authorized, without necessity of further court order, to return seized items to any known victims(s) if such items have been photographically documented.

12/12/09 @ 6:46p
Date and Time warrant issued

Judge of the Superior Court

EXHIBIT D

FILED
ALAMEDA COUNTY
DEC 1 4 2009
CLERK OF THE SUPERIOR COURT
By _____ Deputy

# ♦ AFFIDAVIT ♦

**Affiant's name and agency:**
Detective Nicole Miller #32, University of California Police Department, Berkeley

**Incorporation:** The facts in support of this warrant are contained in the Statement of Probable Cause which is incorporated by reference. Incorporated by reference and attached hereto are Exhibit 1A, describing the places(s) to be searched; and Exhibit 1B, describing the evidence to be seized.

**Evidence type:** (Penal Code § 1524)

- ☐ Stolen or embezzled property.
- ☒ Property or things used as a means of committing a felony.
- ☐ Property or things in the possession of any person with the intent to use it as a means of committing a public offense, or in the possession of another to whom he or she may have delivered it for the purpose of concealing it or preventing its being discovered.
- ☒ Property or things that are evidence that tends to show a felony has been committed, or tends to show that a particular person has committed a felony.
- ☐ Property or things consisting of evidence that tends to show that sexual exploitation of a child, in violation of Penal Code § 311.3, or possession of matter depicting sexual conduct of a person under the age of 18 years, in violation of Penal Code § 311.11 has occurred or is occurring.

☐ **Videotaping Order:** In order that the execution of this warrant, the condition of the premises and materials, and the relationships of each to others be fully documented, it is directed that a videotape record be made.

☐ **Night Service:** [If checked] Authorization for night service is requested based on information contained in the Statement of Probable Cause, filed herewith.

**Declaration:** I declare under penalty of perjury that the information within my personal knowledge contained in this affidavit, including all incorporated documents, is true.

Saturday, December 12, 2009
**Date**

Det. Nicole Miller #32, Affiant

## STATEMENT OF PROBABLE CAUSE

### Affiant Introduction

My name is Nicole A. Miller and I am employed as a police officer for the University of California Police Department (UCPD) in Berkeley, California. I have been employed by the department for eight years and a police officer since February of 2007. I am currently assigned to the Criminal Investigation Bureau as a detective. During my employment with UCPD I have had the opportunity to work numerous demonstrations and protests.

### Case Background

On 12/11/09 at 2306 hours, several University of California Police Department (UCPD) Officers responded to the report of a large group of people, approximately 75-100, walking westbound on Hearst Avenue, near Euclid Avenue in Berkeley, CA. It was reported that some members of the group were wearing ski masks and throwing trash cans at businesses and passing cars. At 2313 hours UCPD dispatch reported that the group was headed to University House, the home of the University of California at Berkeley, Chancellor. UCPD dispatch also reported at 2313 hours, that the group was attempting to break into the Chancellor's house.

UCPD Officers responded to the Chancellor's house with emergency lights and sirens and observed a large group of people around the driveway of the house and around the front door of the house. Some members of the crowd began to disperse as officers arrived. Officers could see that members of the crowd were holding items in their hands that were burning. Some members of the group threw burning items at marked patrol cars arriving in the area, at the Chancellor's house and into the foliage surrounding the house. Officers also reported seeing flashes of light similar to those of a camera flash in the area of the house.

Officer Wyckoff #48 detained and arrested MORSE, David (WM-41) as he was running down the front steps on the south side of the Chancellor's house. At the time of his arrest MORSE had a camera in his hand that was seized as evidence. MORSE also had two CD-R discs in his possession that were seized as evidence.

Officers Syto #41 and Wong #88 located BOWIN, Zachery (WM-21-S), ALLEN, Donnell (MB-41-O) and MILLER, Angela (FW-20-S) hiding in the creek directly southeast of the Chancellor's house. BOWIN, ALLEN and MILLER were detained and arrested. While searching the creek area southeast of the Chancellor's house Officer Odyniec #79 located a subject who attempted to flee. Officer Odyniec #79 pursued and detained the subject who was identified as JAMES, Carwil R. (MB-24-O). During a search subject to arrest a camera and Micro SD media card were located in the backpack that JAMES had in his possession.

Sgt. Tucker #13 and Officer Choo #71 located, detained and arrested, LITMAN-CLEPER, Julia (FW-20-S) and THATCHER, Laura (FW-21-S) near the garage of the Chancellor's house. While searching LITMAN-CLEPER subject to arrest Officer Choo #71 located a camera on LITMAN-CLEPER's person. Officer Choo #71 seized the camera as potential evidence.

Officer Garlick #50 detained, and later arrested, an individual on Hearst Avenue, directly north of the Chancellor's house. The individual was wearing a dark colored bandana that covered the lower portion of his face. Officer Garlick #50 identified the subject as FRIESEN, John (MW-25-O) who had been arrested earlier for trespassing at Wheeler Hall. FRIESEN spontaneously stated to Officer Garlick #50 that he had been "walking with a group of people. They were chanting "whose streets, our streets"."

Upon further investigation of the Chancellor's house substantial damage was discovered. Numerous light leading up to the home had been broken and glass from the fixtures was scattered on the ground. Several large terra-cotta planters had been broken. Pieces of the planters as well as the shrubs planted in them were scattered around the front yard and up the stairs to the entry of the house. A large garbage can was lying in of the front door to the house and recyclables and garbage were strewn around the front porch. The remains of a hand made torch were located directly outside the front door to the residence. The window to the east of the front door was shattered by a piece of terra-cotta planter. The window was hit with enough force to break the window frame.

There was a footprint to the window west of the front door but no further damage. The next window to the west was hit with an unknown object with enough force to cause glass to spray five feet into the room.

The Chancellor's wife stated that she heard chanting that sounded close to the house. She then heard several loud bangs on the south side of the house and feared that the group was attempting to enter the house. The chanting and disturbance frightened the Chancellor's wife and she retreated upstairs to a safe location. She woke the Chancellor and he called for police assistance. Both the Chancellor and his wife were visibly shaken by the incident.

Based on my training and experience I know that individuals that take part in demonstrations and protest regularly take photographs and videos of their events. The photographs ad videos are often later posted to internet websites or used to promote future events. Photographs, videos and other documents are often stored or saved on to digital media such as Compact Discs (CDs), Digital Versatile Discs (DVDs), digital media cards, hard drives and smart phones.

I also know that cell phones are used to communicate event locations and rally points. These communications can be in the form of voice and text messages. It is also common practice for individuals that use cell phones to keep contact information for their associates in "Phone Book" and or "Contacts" lists.

I request that the court authorize the search of cameras, CDs, DVDs, media cards and any other digital media located during the above mention incident. I further request that the court authorize the ability to bypass all electronic security features such as password protection and encryption on cellular phones. I believe that the items seized during the above mentioned arrests will provide further evidence of the criminal acts that were committed. I also believe that the items seized will provide investigative leads relevant to this criminal investigation.

Declaration: I declare under penalty of perjury that the information within my personal knowledge contained in this statement of probable cause is true.

12/k/08  1840
**Date and Time**

Det. Nicole Miller #32, Affiant

2-12-09, 6:39 p
**Date and Time**

Judge of the Superior Court

EXHIBIT E

# UNIVERSITY OF CALIFORNIA, BERKELEY

BERKELEY • DAVIS • IRVINE • LOS ANGELES • MERCED • RIVERSIDE • SAN DIEGO • SAN FRANCISCO



SANTA BARBARA • SANTA CRUZ

Police Department

ROOM 1 SPROUL HALL #1199
BERKELEY, CALIFORNIA 94720-1199

## REPORT VERIFICATION

09-05768
REPORT NUMBER

Friday, December 11, 2009 at 23:13
DATE/ TIME REPORTED

Friday, December 11, 2009 at 23:13
DATE/ TIME OCCURRED

University House
LOCATION OCCURED

245(c) PC x2, 594(B)(1) PC, 664/459 PC,
664/451 PC, 405 PC, 71 PC and 626.6 PC
COMPLAINT/ INCIDENT TYPE

C. Manchester, #98

REPORTING OFFICER

FACTUAL CIRCUMSTANCES:

| Case Number and Classification(s) | Synopsis | Assigned Officer(s) |
|---|---|---|
| 09-05768 245(c) PC x2 594(B)(1) PC 664/459 PC 664/451 PC 405 PC 71 PC 626.6 PC | 23:13 - MILLER, Angela (FW-20- S) arrested for two counts of assault with a deadly weapon on a police officer, vandalism causing damage greater than $400, attempted burglary, attempted arson of an inhabited dwelling, participating in a riot, threatening a university official, and excluded from UC property for 14 days, University House. Actual damage to property is approximately $18,000. Additional charge of violation of an exclusion order for All TOT Santa Rita Jail. Case closed. | C. Manchester |

N/A
INJURIES INVOLVED

Yes
WEAPONS INVOLVED

Yes – actual damage approximately $18,000
PROPERTY INVOLVED

G. Voit, #130 2/16/10
RELEASED BY/ DATE

Records Supervisor
TITLE

This information is released as public information in compliance with 6254(f) of the Government Code of California.

Received
Student Conduct &

FEB 16 20--

Community Standards
2536 Channing Wy

| CRIME REPORT | UNIVERSITY OF CALIFORNIA | | 2. CASE NUMBER |
|---|---|---|---|
| 1. ☒ ARREST  ☐ TO BPO JAIL | POLICE DEPARTMENT | | 09-05768 |
| ☐ FIELD CITE  ☒ TO CO. JAIL | BERKELEY | | |
| ☐ CONFISCATION  ☐ TO JUV. HALL | CA 0019700 | | 3. PAGE 1 OF 10 |

**4. OFFENSE(S) (IN SEQUENCE OF OCCURRENCE)**
594(b)(1) PC, 405 PC, 245(c) PC X 2, 664 PC/459 PC, 664 PC/451(b) PC, 71 PC

☐ OUTSIDE ASSIST   TO:   THEIR CASE #:

**5. CRIME(S)**
Vandalism causing damage over $400.00 , Participating in a riot, Assault with a deadly weapon against a police officer, Attempted Burglary, Attempted Arson of an inhabited property, Threatening a University official

**6. CLASSIFICATION**
☒ FELONY  ☒ PERSON
☒ MISD  ☒ PROPERTY

**7.**
☒ ADULT
☐ JUVENILE

| 8. DATE OCCURRED FROM | 9.TIME | 10.DAY | 11. DATE OCCURRED TO | 12.TIME | 13. DAY | 14. DATE REPORTED | 15.TIME | 18.DAY |
|---|---|---|---|---|---|---|---|---|
| 12-11-09 | 2306 | Thurs | 12-11-09 | 2314 | Thurs | 12-11-09 | 2313 | Thurs |

**17. LOCATION OF OFFENSE**
University House (UC Berkeley)

| 18. V | 19. NAME/FIRM NAME (LAST, FIRST, MIDDLE) The Regents of the University of California | 20. RACE | 21. SEX | 22. DOB |
|---|---|---|---|---|

| 23. RESIDENCE ADDRESS, CITY, STATE, ZIP | 24. ☐ STUDENT ☐ EMPLOYEE ☐ OTHER | 25. RESIDENCE PHONE ( ) |
|---|---|---|

| 26. BUSINESS/SCHOOL ADDRESS, CITY, STATE, ZIP | | 27. BUSINESS PHONE ( ) - |
|---|---|---|

| 28. OCCUPATION | 29. WORK HOURS | 30. DL NUMBER/STATE | 31. EMAIL ADDRESS |
|---|---|---|---|

| 32. VICTIM'S ACTIVITY AT TIME OF OFFENSE | 33. VICTIM'S PHYSICAL CONDITION |
|---|---|

| 34. V'S VEHICLE LIC. NO/STATE | 35. VICTIM'S VEHICLE YEAR, MAKE, MODEL, BODY STYLE | 36. TOP COLOR | 37. BOTTOM COLOR |
|---|---|---|---|

| 38.CODE V | 39. NAME/FIRM NAME /LAST. FIRST. MIDDLE) | 40.RACE | 41.SEX | 42.DOB |
|---|---|---|---|---|

| 43. RESIDENCE ADDRESS, CITY, STATE, ZIP | 44. ☐ STUDENT ☒ EMPLOYEE ☐ OTHER | 45. RESIDENCE PHONE ( ) |
|---|---|---|

| 46. BUSINESS/SCHOOL ADDRESS, CITY, STATE, ZIP | | 47. BUSINESS PHONE ( ) |
|---|---|---|

| 48. OCCUPATION | 49. WORK HOURS | 50. DL NUMBER/STATE | 51. EMAIL ADDRESS |
|---|---|---|---|

| 52. S-1 | 53. NAME/FIRM NAME (LAST, FIRST, MIDDLE) | 54.RACE | 55. SEX | 56. HT | 57. WT | 58. HAIR | 59.EYES | 60. DOB |
|---|---|---|---|---|---|---|---|---|

| 61. RESIDENCE ADDRESS. CITY. STATE. ZIP | | | 62. PFN NUMBER | 63. ☒ STUDENT ☐ EMPLOYEE ☐ OTHER |
|---|---|---|---|---|

| 64. S-2 | 65. NAME/FIRM NAME (LAST, FIRST, MIDDLE) | 66.RACE | 67. SEX | 68. HT | 69. WT | 70. HAIR | 71 EYES | 72. DOB |
|---|---|---|---|---|---|---|---|---|

| 73. RESIDENCE ADDRESS, CITY, STATE, ZIP | | 74. PFN NUMBER | 75. ☐ STUDENT ☐ EMPLOYEE ☒ OTHER |
|---|---|---|---|

**76. HAIR LENGTH**
A ☐ UNKNOWN
B ☐ BALD
C ☐ COLLAR
D ☐ LONG
E ☐ RECEDING
F ☐ SHOULDER
G ☐ SHORT
H ☐ MEDIUM
I ☐ OTHER

**77. HAIR TEXTURE**
A ☐ SUSPECT
B ☐ UNKNOWN
C ☐ COARSE
D ☐ FINE
E ☐ SHAVED
F ☐ THICK
G ☐ THINNING
H ☐ WIRY
☐ OTHER

**78. HAIR STYLE**
A ☐ SUSPECT
B ☐ UNKNOWN
C ☐ AFRO/NATURAL
D ☐ BRAIDED
E ☐ BUSHY
F ☐ CREW CUT
G ☐ GREASY
H ☐ GOATEE
I ☐ LOWER LIP
J ☐ PONYTAIL
K ☐ DRED LOCKS
☐ STRAIGHT
☐ OTHER

**79. FACIAL HAIR**
A ☐ SUSPECT
B ☐ UNKNOWN
C ☐ FU MANCHU
D ☐ FULL BEARD
E ☐ FUZZ
F ☐ GOATEE
G ☐ LOWER LIP
H ☐ MUSTACHE
I ☐ SIDE BURNS
J ☐ UNSHAVEN
☐ OTHER

**80. COMPLEXION**
A ☐ SUSPECT
B ☐ UNKNOWN
C ☐ ACNE
D ☐ DARK
E ☐ FRECKLES
F ☐ LIGHT
G ☐ MEDIUM
H ☐ PALE
☐ POCKED
☐ RUDDY
☐ TANNED
☐ OTHER

**81. TATTOOS/SCARS & TYPE**
A ☐ SUSPECT
B ☐ UNKNOWN
C ☐ ABDOMEN
D ☐ ARM
E ☐ FOOT
F ☐ HAND
G ☐ HEAD/FACE
H ☐ LEG
I ☐ SHOULDER
☐ OTHER

**82.GENERAL APPEARANCE**
A ☐ SUSPECT
B ☐ UNKNOWN
C ☐ CONSERVATIVE
D ☐ DIRTY
E ☐ DISGUISED
F ☐ FLASHY
G ☐ GOOD LOOKING
H ☐ MILITARY
I ☐ UNKEMPT
J ☐ UNUSUAL ODOR
K ☐ WELL GROOMED
L ☐ CASUAL
☐ OTHER

**83. DEMEANOR**
A ☐ SUSPECT
B ☐ UNKNOWN
C ☐ ANGRY
D ☐ APOLOGETIC
E ☐ CALM
F ☐ DISORGANIZED
G ☐ IRRITABLE
H ☐ NERVOUS
I ☐ POLITE
J ☐ PROFESSIONAL
K ☐ STUPOR
☐ VIOLENT

**84. SPEECH**
A ☐ SUSPECT
B ☐ UNKNOWN
C ☐ ACCENT
D ☐ LISPEN
E ☐ MUMBLED
F ☐ OFFENSIVE
G ☐ QUIET
H ☐ RAPID
I ☐ SLOW
J ☐ SLURRED
☐ STUTTERED
☐ TALKATIVE

**85. BUILD**
A ☐ SUSPECT
B ☐ UNKNOWN
C ☐ FAT/HEAVY
D ☐ MEDIUM
E ☐ THIN
F ☐ MUSCULAR
☐ SKINNY

**86. RIGHT/LEFT HANDED**
☐ UNKNOWN
☐ RIGHT
☐ LEFT

**87. FACE**
A ☐ SUSPECT
B ☐ UNKNOWN
C ☐ BROAD
D ☐ HIGH CHEEK
E ☐ LONG
F ☐ OVAL
G ☐ ROUND
H ☐ SQUARE
I ☐ THIN
☐ OTHER

**88. GLASSES**
A ☐ SUSPECT
B ☐ UNKNOWN
C ☐ NONE
D ☐ CONTACT LENSES
E ☐ MIRRORED
F ☐ PLASTIC FRAME
G ☐ PRESCRIPTION
H ☐ TINTED GLASS
I ☐ WIRE FRAME
☐ OTHER

**89. FRAME COLOR**

**90. SUSPECT 1 CLOTHING DESCRIPTION**
A ☐ UNKNOWN
B ☐ CAP
C ☐ HAT
D ☐ VEST
E ☐ SKI MASK
F ☐ STOCKING MASK
G ☐ COAT
H ☐ JACKET
I ☐ OTHER

**91. SUSPECT 2 CLOTHING DESCRIPTION**
A ☐ UNKNOWN
B ☐ BLOUSE
C ☐ PANTS
D ☐ SHIRT
E ☐ SKIRT
F ☐ SHORTS
G ☐ DRESS
H ☐ SHOES

**92. WEAPON TYPE**
A ☐ SUSPECT
B ☐ NONE
C ☐ UNKNOWN
D ☐ BROOK/ROCK
E ☐ BUTCHER KNIFE
F ☐ CLUB
G ☐ HAND GUN
H ☐ HANDS/FEET
I ☐ POCKET KNIFE
J ☐ RIFLE
☐ SHIRT
☐ BLOUSE
☐ PANTS
☐ SKIRT
☐ SHORTS
☐ DRESS
☐ SHOES
☐ GLOVES
I ☐ SIMULATED
J ☐ SHOTGUN
K ☐ TOY GUN
☐ OTHER Ltr Torches

| 93. OTHER REPORTS ☐ ARREST ☐ ACCIDENT ☒ PROPERTY ATTACHED: | 94. COPIES ☒ DETECTIVES ☒ DISTRICT ATTY. ☐ CII ☒ OTHER SSTC# |
|---|---|
| ☐ VEHICLE ☐ CONTINUATION ☐ SUPPLEMENTAL TO: ☐ PATROL ☐ | ☒ RISK MGT. ☐ OTHER S_____ |
| 95. REPORTING OFFICER C. Manchester   #98 | 96. DATE/TIME 12-11-09 / 0425 hrs. | 97. APPROVING SUPERVISOR | 98. DATE |

| 99. THIS CASE IS/WAS: | | 100. CLEARANCE STATUS: |
|---|---|---|
| ☒ ALCOHOL RELATED | ☐ GANG RELATED | ☐ HATE INCIDENT | ☐ CLEARED BY ARREST | ☐ EXCEPTIONAL CLEARANCE | ☐ UNFOUNDED |
| ☒ DOMESTIC VIOLENCE | ☐ HAZ MAT | ☒ WEAPONS RELATED | |

ROUTED TO   ROUTED BY   Date

| ADDITIONAL NAMES | UNIVERSITY OF CALIFORNIA | 2. CASE NUMBER |
|---|---|---|
| 1. ☐ INCIDENT REPORT | POLICE DEPARTMENT | 09-05768 |
| ☒ CRIME REPORT | BERKELEY | |
| ☒ ARREST REPORT | CA 0019700 | 3. PAGE 2 OF 10 |

| 4. CODE S | 5. NAME/FIRM NAME (LAST, FIRST, MIDDLE) | 6 RACE | 7. SEX | 8. HT | 9. WT | 10. HAIR | 11. EYES | 12. DOB |
|---|---|---|---|---|---|---|---|---|
| 13. RESIDENCE ADDRESS, CITY, STATE, ZIP | | | | | 14. ☐ STUDENT ☐ EMPLOYEE ☒ OTHER | | 15. RESIDENCE PHONE | |
| 16 BUSINESS/SCHOOL ADDRESS, CITY, STATE, ZIP | | | | | | | 17. BUSINESS PHONE | |
| 18. OCCUPATION | 19. WORK HOURS | | 20. DL NUMBER/STATE | | 21. EMAIL ADDRESS | | | |

| 22. CODE S | 23. NAME/FIRM NAME (LAST, FIRST, MIDDLE) | 24. RACE | 25. SEX | 26. HT | 27 WT | 28. HAIR | 29 EYES | 30. DOB |
|---|---|---|---|---|---|---|---|---|
| 31. RESIDENCE ADDRESS, CITY, STATE, ZIP | | | | | 32. ☐ STUDENT ☐ EMPLOYEE ☒ OTHER | | 33. RESIDENCE PHONE | |
| 34. BUSINESS/SCHOOL ADDRESS, CITY, STATE, ZIP | | | | | | | 35. BUSINESS PHONE | |
| 36. OCCUPATION | 37. WORK HOURS | | 38. DL NUMBER/STATE | | 39 EMAIL ADDRESS | | | |

| 40. CODE S | 41. NAME/FIRM NAME (LAST, FIRST, MIDDLE) | 42. RACE | 43. SEX | 44. HT | 45 WT | 46. HAIR | 47. EYES | 48. DOB |
|---|---|---|---|---|---|---|---|---|
| 49. RESIDENCE ADDRESS, CITY, STATE, ZIP | | | | | 50. ☒ STUDENT ☐ EMPLOYEE ☐ OTHER | | 51. RESIDENCE PHONE | |
| 52 BUSINESS/SCHOOL ADDRESS, CITY, STATE, ZIP | | | | | | | 53. BUSINESS PHONE | |
| 54 OCCUPATION | 55. WORK HOURS | | 56. DL NUMBER/STATE | | 57. EMAIL ADDRESS | | | |

| 58. CODE S | 59. NAME/FIRM NAME (LAST, FIRST, MIDDLE) | 60. RACE | 61. SEX | 62. HT | 63. WT | 64. HAIR | 65. EYES | 66 DOB |
|---|---|---|---|---|---|---|---|---|
| 67. RESIDENCE ADDRESS, CITY, STATE, ZIP | | | | | 68. ☒ STUDENT ☐ EMPLOYEE ☐ OTHER | | 69 RESIDENCE PHONE | |
| 70 BUSINESS/SCHOOL ADDRESS, CITY, STATE, ZIP | | | | | | | 71. BUSINESS PHONE | |
| 72 OCCUPATION | 73. WORK HOURS | | 74. DL NUMBER/STATE | | 75. EMAIL ADDRESS | | | |

| 76. CODE S | 77. NAME/FIRM NAME (LAST, FIRST, MIDDLE) | 78 RACE | 79 SEX | 80. HT | 81. WT | 82 HAIR | 83. EYES | 84 DOB |
|---|---|---|---|---|---|---|---|---|
| 85 RESIDENCE ADDRESS, CITY, STATE, ZIP | | | | | 86. ☐ STUDENT ☐ EMPLOYEE ☒ OTHER | | 87 RESIDENCE PHONE | |
| 88. BUSINESS/SCHOOL ADDRESS, CITY, STATE, ZIP | | | | | | | 89. BUSINESS PHONE | |
| 90. OCCUPATION | 91. WORK HOURS | | 92. DL NUMBER/STATE | | 93. EMAIL ADDRESS | | | |

| 94. CODE S | 95. NAME/FIRM NAME (LAST, FIRST, MIDDLE) | 96. RACE | 97. SEX | 98. HT | 99. WT | 100.HAIR | 101.EYES | 102 DOB |
|---|---|---|---|---|---|---|---|---|
| 103. RESIDENCE ADDRESS, CITY, STATE, ZIP | | | | | 104. ☒ STUDENT ☐ EMPLOYEE ☐ OTHER | | 105. RESIDENCE PHONE | |
| 106. BUSINESS/SCHOOL ADDRESS, CITY, STATE, ZIP | | | | | | | 107. BUSINESS PHONE | |
| 108. OCCUPATION | 109. WORK HOURS | | 110. DL NUMBER/STATE | | 111. EMAIL ADDRESS | | | |

| 112. OTHER REORTS ATTACHED: ☒ CONTINUATION ☒ ADDITIONAL NAMES ☐ VEHICLE | 113. COPIES TO: | ☒ DETECTIVES ☒ PATROL | ☒ DISTRICT ATTY. ☐ RISK MGT. | ☐ E.H&S ☒ OTHER SJA | ☐ CPU |
|---|---|---|---|---|---|
| 114. REPORTING OFFICER Manchester #98 | 115. DATE AND TIME 12-12-09 / 1423 hrs. | 116. APPROVING SUPERVISOR | | 117. DATE 12/12/09 |

## ADDITIONAL NAMES

1. ☐ INCIDENT REPORT

☒ CRIME REPORT

☒ ARREST REPORT

### UNIVERSITY OF CALIFORNIA
### POLICE DEPARTMENT
### BERKELEY
### CA 0019700

2. CASE NUMBER
09-05768

3. PAGE 3 OF 10

| 4. CODE V | 5. NAME/FIRM NAME (LAST, FIRST, MIDDLE) | 6 RACE | 7 SEX | 8. HT | 9. WT | 10. HAIR | 11.EYES | 12. DOB |
|---|---|---|---|---|---|---|---|---|

13. RESIDENCE ADDRESS, CITY, STATE, ZIP

14. ☐ STUDENT ☐ EMPLOYEE ☒ OTHER

15. RESIDENCE PHONE ( )

16. BUSINESS/SCHOOL ADDRESS, CITY, STATE, ZIP

17. BUSINESS PHONE (

18. OCCUPATION    19 WORK HOURS    20. DL NUMBER/STATE    21. EMAIL ADDRESS

| 22. CODE | 23. NAME/FIRM NAME (LAST, FIRST, MIDDLE) | 24. RACE | 25. SEX | 26. HT | 27. WT | 28. HAIR | 29.EYES | 30. DOB |
|---|---|---|---|---|---|---|---|---|

31. RESIDENCE ADDRESS, CITY, STATE, ZIP

32. ☐ STUDENT ☐ EMPLOYEE ☐ OTHER

33. RESIDENCE PHONE ( ) -

34. BUSINESS/SCHOOL ADDRESS, CITY, STATE, ZIP

35. BUSINESS PHONE ( ) -

36. OCCUPATION    37. WORK HOURS    38. DL NUMBER/STATE    39. EMAIL ADDRESS

| 40. CODE | 41. NAME/FIRM NAME (LAST, FIRST, MIDDLE) | 42. RACE | 43. SEX | 44. HT | 45.WT | 46. HAIR | 47.EYES | 48. DOB |
|---|---|---|---|---|---|---|---|---|

49. RESIDENCE ADDRESS, CITY, STATE, ZIP

50. ☐ STUDENT ☐ EMPLOYEE ☐ OTHER

51. RESIDENCE PHONE ( ) -

52. BUSINESS/SCHOOL ADDRESS, CITY, STATE, ZIP

53. BUSINESS PHONE ( )

54. OCCUPATION    55. WORK HOURS    56. DL NUMBER/STATE    57. EMAIL ADDRESS .

| 58. CODE | 59. NAME/FIRM NAME (LAST, FIRST, MIDDLE) | 60. RACE | 61. SEX | 62. HT | 63. WT | 64. HAIR | 65.EYES | 66. DOB |
|---|---|---|---|---|---|---|---|---|

67. RESIDENCE ADDRESS, CITY, STATE, ZIP

68. ☐ STUDENT ☐ EMPLOYEE ☐ OTHER

69. RESIDENCE PHONE ( )

70. BUSINESS/SCHOOL ADDRESS, CITY, STATE, ZIP

71. BUSINESS PHONE ( ) -

72. OCCUPATION    73. WORK HOURS    74. DL NUMBER/STATE    75. EMAIL ADDRESS

| 76. CODE | 77. NAME/FIRM NAME (LAST, FIRST, MIDDLE) | 78. RACE | 79. SEX | 80. HT | 81. WT | 82. HAIR | 83.EYES | 84. DOB |
|---|---|---|---|---|---|---|---|---|

85. RESIDENCE ADDRESS, CITY, STATE, ZIP

86. ☐ STUDENT ☐ EMPLOYEE ☐ OTHER

87. RESIDENCE PHONE ( )

88. BUSINESS/SCHOOL ADDRESS, CITY, STATE, ZIP

89. BUSINESS PHONE ( )

90. OCCUPATION    91. WORK HOURS    92. DL NUMBER/STATE    93. EMAIL ADDRESS

| 94. CODE | 95. NAME/FIRM NAME (LAST, FIRST, MIDDLE) | 96. RACE | 97. SEX | 98. HT | 99. WT | 100.HAIR | 101.EYES | 102. DOB |
|---|---|---|---|---|---|---|---|---|

103. RESIDENCE ADDRESS, CITY, STATE, ZIP

104. ☐ STUDENT ☐ EMPLOYEE ☐ OTHER

105. RESIDENCE PHONE ( )

106. BUSINESS/SCHOOL ADDRESS, CITY, STATE, ZIP

107. BUSINESS PHONE ( ) -

108. OCCUPATION    109. WORK HOURS    110. DL NUMBER/STATE    111. EMAIL ADDRESS

112. OTHER REORTS ATTACHED: ☒ CONTINUATION ☐ ADDITIONAL NAMES ☐ VEHICLE

113. COPIES TO: ☒ DETECTIVES ☐ PATROL ☒ DISTRICT ATTY. ☐ RISK MGT. ☐ E.H&S ☐ OTHER ☐ CPU

114. REPORTING OFFICER
C. Manchester    #98

115. DATE AND TIME
12-12-0- / 1427 hrs.

116. APPROVING SUPERVISOR

117. DATE
12/12/09

UCBPD (4-89)

| CONTINUATION REPORT | UNIVERSITY OF CALIFORNIA POLICE DEPARTMENT BERKELEY CA 0019700 | 2. CASE NUMBER 09-05768 |
|---|---|---|
| ☐ INCIDENT REPORT ☒ CRIME REPORT ☒ ARREST REPORT | | 3. PAGE 4 OF 10 |

**4. $ LOSS**

**5. PROPERTY TYPE** (Check no more than three)

☐ NONE
A. ☐ SMALL APPLIANCES
B. ☐ MAJOR APPLIANCES
C. ☐ STEREO/RADIO/TAPE
D. ☐ DRUGS&MEDICAL
E. ☐ JEWELRY
F. ☐ CURRENCY
G. ☐ PURSE/WALLET
H. ☐ TV/VIDEO
I. ☐ TOOLS
J. ☐ COMPUTERS
K. ☐ OTHER OFFICE
L. ☐ ART ITEMS
M. ☐ FOOD
N. ☐ FURNITURE
O. ☐ FIREARM/KNIFE
P. ☐ PHOTO EQUIPMENT
Q. ☐ PERSONAL I.D.
R. ☐ PROPERTY DAMAGE
S. ☐ OTHER

**6. OBJECT OF ATTACK NON RESIDENTIAL STRUCTURE** (CHECK ONE)

A. ☐ RENTAL BOOKSTORE
B. ☐ RECREATIONAL/ ENTERTAINMENT
C. ☐ OFFICES
D. ☐ LIBRARY
E. ☐ INSTRUCTIONAL
F. ☐ BARN/ANIMAL
G. ☐ FOOD SERVICE BAR
H. ☐ MEDICAL/VETERINARY
I. ☐ STORAGE/DOCK
J. ☐ GYM/LOCKER ROOM
K. ☐ PARKING FACILITY
L. ☐ SPROUL PLAZA
M. ☐ PEOPLES PARK
N. ☐ OTHER

**7. SPECIAL CONSIDERATION**

O. ☐ UNIVERSITY PROPERTY
P. ☐ PERSONAL PROPERTY
Q. ☐ DOMESTIC VIOLENCE
R. ☐ CHILD ABUSE
S. ☐ GANG RELATED
T. ☐ ALCOHOL RELATED
U. ☐ WEAPONS RELATED

**8. OBJECT OF ATTACK RESIDENTIAL STRUCTURE** (CHECK ONE)

A. ☐ UNIT I
B. ☐ UNIT II
C. ☐ UNIT III
D. ☐ CKC
E. ☐ XTREME HOUSE
F. ☐ I-HOUSE
G. ☐ SMYTHE-FERNWALD
H. ☐ ALBANY VILLAGE
I. ☐ OTHER

**9. VICTIM SUSPECT RELATION**

A. ☐ UNKNOWN
B. ☐ SPOUSE
C. ☐ RELATIVE
D. ☐ ROOMMATE
E. ☐ BOY/GIRL FRIEND
F. ☐ ACQUAINTANCE
G. ☐ TEACHER/STUDENT
H. ☐ STRANGER
I. ☐ EMPLOYEE
J. ☐ STUDENT
K. ☐ OTHER

**10. POINT OF ENTRY** (CHECK NO MORE THAN 2)

A. ☐ UNKNOWN
B. ☐ FRONT
C. ☐ REAR
D. ☐ SIDE
E. ☐ GROUND LEVEL
F. ☐ UPPER LEVEL
G. ☐ DOOR
H. ☐ WINDOW
I. ☐ SLIDING DOOR
J. ☐ DUCT OR VENT
K. ☐ ADJ. BUILDING
L. ☐ ROOF
M. ☐ FLOOR
N. ☐ WALL
O. ☐ GARAGE
P. ☐ BASEMENT
Q. ☐ WING WINDOW
R. ☐ WINDOW MOLDING
S. ☐ SIDE WINDOW
T. ☐ WINDSHIELD
U. ☐ TRUNK
V. ☐ OTHER

**10. STRUCTURE ALARMS**

A. ☐ N/A
B. ☐ YES
C. ☐ NO
D. ☐ ACTIVATION

**12. METHOD OF ENTRY** (CHECK NO MORE THAN 2)

A. ☐ UNKNOWN
B. ☐ ATTEMPT ONLY
C. ☐ BODILY FORCE
D. ☐ BOLT CUTTER
E. ☐ BRICK/ROCK
F. ☐ CHANNEL LOCK
G. ☐ UNLOCKED DOOR/WINDOW
H. ☐ HID IN BUILDING
I. ☐ KEY
J. ☐ NO FORCE
K. ☐ PIPE WRENCH
L. ☐ PLIERS
M. ☐ PRY BAR
N. ☐ PUNCH
O. ☐ SAW/BURN/DRILL
P. ☐ SCREWDRIVER
Q. ☐ TAPE/WIRE
R. ☐ LOCK CHEAT
S. ☐ WINDOW SMASHED
T. ☐ WINDWING
U. ☐ OTHER

**13. SUSPECT'S ACTIONS** (CHECK NO MORE THAN 2)

A. ☐ NONE
B. ☐ MULTIPLE SUSPECTS
C. ☐ ARMED
D. ☐ MADE THREATS
E. ☐ FAMILIAR W/LOCATION
F. ☐ LIES IN WAIT
G. ☐ TECH SKILL USED
H. ☐ DISABLES PHONE
I. ☐ KNEW V'S NAME
J. ☐ SMOKED ON PREMISES
K. ☐ ATE/DRANK ON PREMISES
L. ☐ DEFICATE/URINATES
M. ☐ UNUSUAL BODY ODOR
N. ☐ HAD BEEN DRINKING
O. ☐ INFLUENCE OF DRUGS
P. ☐ VEHICLE USED
Q. ☐ RANSACK/PROWL
R. ☐ SELECTIVE PROWL
S. ☐ LEAVES OTHER VALUABLES
T. ☐ USES NOTE

**14. PROPERTY CODES**

S-STOLEN   R-RECOVERED   L-LOST   F-FOUND   S/R-STOLEN/RECOVERED   O-OBSERVED   E-EVIDENCE   X-MISCELLANEOUS

| CODE | ITEM | QTY | KIND OF ARTICLE | BRAND NAME | MODEL NAME/NO. | DESCRIPTION/COLOR | SERIAL NO. | VALUE |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

**15.** ☐ WRITTEN STATEMENTS ATTACHED   ☐ NEIGHBORHOOD CHECKS   ☐ VICT OF VIOLENT CRIME FORM   ☐ RESOURCE PAMPHLET GIVEN

☒ ID WORK/PHOTOS TECH NO. 116   ☐ DIAGRAMS   ☐ LAB TEST REQUESTED   ☐ PROPERTY/PERSONS ENTERED BY

| 16. REPORTING OFFICER C. Manchester #98 | 17. DATE AND TIME 12-12-09 / 1756 hrs. | 18. APPROVING SUPERVISOR   S25 | 19. DATE 12/12/09 |
|---|---|---|---|

| CONTINUATION REPORT | | | |
|---|---|---|---|
| 1. ☐ INCIDENT REPORT ☒ CRIME REPORT ☒ ARREST REPORT | UNIVERSITY OF CALIFORNIA POLICE DEPARTMENT BERKELEY CA 0019700 | | 2. CASE NUMBER 09-05768 |
| | | | 3. PAGE 5 OF 10 |

| 4. TYPE REPORT ☒ ORIGINAL ☐ SUPPLEMENT | 5. CODE SECTION/DESCRIPTION 594(b)(1) PC, 405 PC, 245(c) PC X 2, 664 PC/459 PC, 664 PC/451(b) PC, 71 PC | 6. CRIME Vandalism causing damage over $400.00, Participating in a riot, Assault with a deadly weapon against a police officer, Attempted Burglary, Attempted Arson of an inhabited property, Threatening a University official |
|---|---|---|

| 7. INCIDENT DATE 12-11-09 TIME 2306 | 8. INCIDENT LOCATION University House (UC Berkeley) | 9. ADDL. NAMES ATTACHED ☒ YES ☐ NO |
|---|---|---|

**10. NARRATIVE**

**SCENE:**

The crimes took place at the University House which is a University owned and maintained residence that is occupied by the Chancellor of the University of California Berkeley. The University is a multi story home that is located on the far north end of the UC Berkeley campus. The front of the University House is located on the south side of the home. At that location, there is a flight of stairs that goes up to the home from the driveway. On both sides of the flight of stairs there are large light posts with large bulbous light fixtures on them. Some of those light fixtures were broken during the riot. At the top of the stairs, there is a flat area that has concrete in the middle and grass on either side of the concrete. This area is sounded by shrubs that make kind of a natural wall around the front yard of the home. The concrete section leads up to another flight of stairs which take you to the front door of the home. It is at this location, the majority of the damage took place. There are four large windows on the first floor level of the home. Two of which were shattered. It appeared that the suspects attempted to break the other two windows, but failed. This incident took place during the hours of darkness. The University House is the property of the Regents of the University of California.

**SUMMARY:**

On 12-11-09, I arrested

594(b)(1) PC (Vandalism causing damage over $400.00), 405 PC (Participating in a riot), and 245(c) PC X 2 (Assault with a deadly weapon against a police officer), 664 PC/459 PC (Attempted Burglary), 664PC/451(b) PC (Attempted Arson of an inhabited property), and 71 PC (Threatening a University Official). All eight subjects were transported to the Santa Rita Jail for booking. Officer Wyckoff issued all of the non student affiliates a Notice of Immediate Exclusion From The University of California Berkeley pursuant to section 626.6 of the California Penal Code. This stay away order is good for 7 calendar days. The suspects that were students were issued a Notice of Immediate Exclusion From The University of California Berkeley pursuant to section 626.4 of the California Penal Code. This stay away order is good for 14 calendar days.

I estimated that there was approximately $5,000 to $10,000 worth of property damage to the University House and property/items outside of the house. We will be requesting an estimate of the cost of repairs to the house and the replacement/repairs of the damaged items out side of the house from our Physical Plant Campus Services (PPCS).

Officer Wyckoff transported all of the prisoner property to UCPD where it was later searched and then placed into the prisoner property area at UCPD.

One camera and four CD's were seized as evidence from ____, and one camera was seized as evidence from ____, and one media card was seized as evidence from ____. Detectives Miller #32 and Reich #83 were given custody of those items and they are working on obtaining a search warrant so they can view the photos and videos that those items may contain.

All other evidence items regarding this case were collected by Officer Torres #43 and SPO Parsley #116. They are in the process of processing and packaging the majority of the evidence items that they collected. Those items were locked and secured in the UCPD crime lab. The photos and the video footage that they took were downloaded on to a CD and book into evidence locker #10 at UCPD.

| 1. COPIES | | | | | | |
|---|---|---|---|---|---|---|
| TO: ☒ DETECTIVES | ☐ PATROL | ☒ DISTRICT ATTY. | ☐ RISK MGT. | ☐ E.H&S | ☐ OTHER | ☐ OTHER |

| 2. REPORTING OFFICER | 13. DATE AND TIME | 14. APPROVING SUPERVISOR | 15. DATE |
|---|---|---|---|
| Manchester #98 | 12-12-09 / 2127 hrs. | 525 | 12/12/09 |

| CONTINUATION REPORT | UNIVERSITY OF CALIFORNIA | | 2. CASE NUMBER |
|---|---|---|---|
| 1. ☐ INCIDENT REPORT | POLICE DEPARTMENT | | 09-05768 |
| ☒ CRIME REPORT | BERKELEY | | |
| ☒ ARREST REPORT | CA 0019700 | | |

| 4. TYPE REPORT | 5. CODE SECTION/DESCRIPTION | 6. CRIME | 3. PAGE 6 OF 10 |
|---|---|---|---|
| ☒ ORIGINAL ☐ SUPPLEMENT | 594(b)(1) PC, 405 PC, 245(c) PC X 2, 664 PC/459 PC, 664 PC/451(b) PC, 71 PC | Vandalism causing damage over $400.00 , Participating in a riot, Assault with a deadly weapon against a police officer, Attempted Burglary, Attempted Arson of an inhabited property, Threatening a University official | |

| 7. INCIDENT | 8. INCIDENT LOCATION | 9. ADDL. NAMES ATTACHED |
|---|---|---|
| DATE 12-11-09    TIME 2306 | University House (UC Berkeley) | ☒ YES  ☐ NO |

**10. NARRATIVE**

**NARRATIVE:**

On 12-11-09, about 2306 hours, Officer Wyckoff and I, along with numerous other officers responded from the station to a report of a large group of people (Approximately 75 to 100) walking westbound on Hearst Avenue near Euclid Avenue. Some of the people in the group were reportedly wearing ski masks and throwing trash cans at cars near Euclid Avenue and Ridge Road. UCPD dispatch reported the call to BPD due to the fact that it was happening on the Berkeley city streets. At about 2311 hours, the call was updated to a report of a large group rioting in the area of Euclid Avenue and Ridge Road. It was also reported that the group was now breaking windows, knocking over items, and damaging cars. Sgt. Tucker #S13 and some other officers responded to the central campus on area on foot and Sgt. Tucker reported that he could hear the group near the northwest area of campus. At 2313 hours, UPCD dispatch reported that the group was headed to the Chancellors house. It was at that point that Officer Wyckoff and I responded to the CX from the west crescent (West end of campus). UCDP dispatch also reported at 2313 hours that the group was now attempting to break into the Chancellors house. In an attempt to stop the group from continuing to break into the Chancellors house, Officer Wyckoff and I turned on our vehicles overhead emergency lights and we activated our siren as we drove up the driveway to the Chancellors house.

As we were driving up the driveway, we could see a large group of people in front of the house. There were groups of people on the driveway level, on or near the south steps leading up to the house and at or near the front door of the house. When we got closer, we could see all of the groups start to disperse. Some of the people in the group that were up near the door ran down the stairs to the driveway level and some ran west bound towards the garage area. The group that was on the driveway level started running west and northbound away from the house. As we pulled up to the front of the house, we could see that some of the people had items in their hands that were burning. Some of the people in the group ran towards us and threw burning items at our police vehicle. I put out over the police radio that we were taking fire bombs. Due to the fact that our windows were down, some of the embers of the burning objects were coming into our vehicle. We had to roll up our windows to prevent ourselves from being burned. At this point, Officer Wyckoff and I were in fear for our safety. I parked the police vehicle in front of the Chancellor's house on the south side. We watch as more people threw burning objects towards the Chancellors backyard into the foliage. I also saw an unknown subject throw a burning object into a tree on the southwest portion of the property. The burning object stayed in the tree burning for about 30 seconds and then it fell down to the ground. From all indications, the crowd was rioting.

Once most of the crowd had dispersed, we exited the vehicle and we saw a male subject coming down the steps of the Chancellors house. Officer Wyckoff detained the suspect for suspicion of participating in a riot and trespassing. At that moment, we did not know the extent of the damage to the Chancellors house. The subject we detained was identified via his valid California Driver's License to be I_____. _____ had a camera in his hand and we seized it as evidence to a crime. _____ claimed that he was a member of the press and that he had a press pass. He also said that he had a right to be here and that he was not doing anything wrong. Officer Wyckoff placed him into handcuffs, checked the cuffs for tightness, and then doubled locked him. We then conducted a quick search of his person for any weapons and then we placed him into our police vehicle. We obtained his press pass and we noticed that it had expired as of December 2008.

Due to the fire concerns, Officer Wyckoff got the fire extinguisher out of our vehicle and extinguished all of the flaming objects which turned out to be large torches that had homemade wicks that were soaked with and unknown accelerant.

**11. COPIES**

| TO: ☒ DETECTIVES ☐ PATROL ☒ DISTRICT ATTY. ☐ RISK MGT. ☐ E.H&S ☐ OTHER ☐ OTHER |
|---|

| 12. REPORTING OFFICER | 13. DATE AND TIME | 14. APPROVING SUPERVISOR | 15. DATE |
|---|---|---|---|
| I. MANCHESTER #98 | 12-12-09 / 2127 hrs. | ___ | S25  12/12/09 |

| CONTINUATION REPORT | UNIVERSITY OF CALIFORNIA | 2. CASE NUMBER |
|---|---|---|
| 1. ☐ INCIDENT REPORT | POLICE DEPARTMENT | 09-05768 |
| ☒ CRIME REPORT | BERKELEY | |
| ☒ ARREST REPORT | CA 0019700 | 3. PAGE 7 OF 10 |

| 4. TYPE REPORT | 5. CODE SECTION/DESCRIPTION | 6. CRIME |
|---|---|---|
| ☒ ORIGINAL ☐ SUPPLEMENT | 594(b)(1) PC, 405 PC, 245(c) PC X 2, 664 PC/459 PC, 664 PC/451(b) PC, 71 PC | Vandalism causing damage over $400.00 , Participating in a riot, Assault with a deadly weapon against a police officer, Attempted Burglary, Attempted Arson of an inhabited property, Threatening a University official |

| 7. INCIDENT | 8. INCIDENT LOCATION | 9. ADDL. NAMES ATTACHED |
|---|---|---|
| DATE 12-11-09   TIME 2306 | University House (UC Berkeley) | ☒ YES ☐ NO |

**10. NARRATIVE**

Other officer's responded to the area both on foot and in vehicles. We also informed BPD of the incident and we requested that they saturate the area for splinter groups. BFD was also notified and they responded to make sure that all of the fires were extinguished at or near the University House.

Sgt Tucker #S13 and Officer's Wong #88, Syto #41, and Odyniec #79 arrived on scene and they started to conduct an area check of the University House and the surrounding areas for any of the fleeing suspects. During the area check, Officer's Wong and Syto, located some suspects hiding in the creek area southeast of the University House. Officer's Wong and Syto stopped and detained three subjects who were later identified to be, I               ), and                         . Officer Odyniec saw a subject whom attempted to flee from him near the area that Officer's Wong and Syto had located their three suspects. Officer Odyniec was able to pursue the fleeing suspect and detained him. The suspect was later identified to be                         Officer's Wong, Syto, and Odyniec walked all four suspects over to the south side of the University House where the police vehicles were located.

Corporal Zuniga #73 arrived on scene and made contact with                         at the front door of the University House. Corporal Zuniga confirmed that              and his wife were safe and unharmed. The Chancellor and his wife were very frightened and they were in fear for their personal safety.

Sgt Tucker located and detained two suspects hiding near the garage of the University House. Officer Choo #71 responded to that location to assist with the stop. The two suspects were identified to be                         ) and                         . Sgt Tucker talked to                         while Officer Choo talked with            . Per Officer Choo's attached supplemental report, Sgt. Tucker requested that Officer Choo interview I            . At the time of the interview, neither subject was handcuffed. In summary,            told Officer Choo that on 12-11-09, between 1700 and 1900 hours, she and            drove in from UC Davis to attend the "Boots Riley" concert that was originally scheduled to take place at Wheeler Hall at 1930 hours. She said that she was aware that UCPD had cleared and secured Wheeler Hall, but her friend had told her to meet at the south steps of the building because the concert was going to still take place, but at an alternate location.            said that her and her friends joined a large group on the south exterior of Wheeler Hall and they later marched to Casa Zimbabwe (A UC Berkeley student co-op house located north of campus at 2422 Ridge Road) It was there that the "Boots Riley" concert took place. After the concert, she accompanied 40 to 50 attendees of Casa Zimbabwe on a march back onto UC campus with flaming torches "For light". They arrived at the University House and shortly thereafter, the situation became volatile. She said that members of the group started "Running everywhere" and "Breaking things." She saw UCPD vehicles approaching and panicked. She said that she first attempted to run westbound and out onto Hearst Avenue, but then she realized that she would not make it. She then turned back and hid in the bushed just west of the backyard access gate on the north side of the University House where she was later discovered by the police.

After conferring with Sgt. Tucker, Officer Choo was instructed to place                         under arrest and he did. He placed her in handcuffs, checked the cuffs for tightness, and then doubled locked them. After interviewing ' Sgt. Tucker placed her under arrest. He placed her in handcuffs, checked the cuffs for tightness, and then doubled locked them. Sgt. Tucker and Officer Choo walked            and            over to the south side of the University House where they were subsequently searched and placed into a transport vehicle. During the search incident to arrest, Officer Choo located a camera on            I seized the camera as possible evidence to this crime

**11. COPIES**

| TO: ☒ DETECTIVES | ☐ PATROL | ☒ DISTRICT ATTY. | ☐ RISK MGT. | ☐ E.H&S | ☐ OTHER | ☐ OTHER |
|---|---|---|---|---|---|---|

| 12. REPORTING OFFICER | 13. DATE AND TIME | 14. APPROVING SUPERVISOR | 15. DATE |
|---|---|---|---|
| I. MANCHESTER #98 | 12-12-09 / 2127 hrs | 525 | 12/12/09 |

| CONTINUATION REPORT | | |
|---|---|---|
| **1.** ☐ INCIDENT REPORT ☒ CRIME REPORT ☒ ARREST REPORT | **UNIVERSITY OF CALIFORNIA POLICE DEPARTMENT BERKELEY CA 0019700** | **2.** CASE NUMBER **09-05768** |

| **4.** TYPE REPORT ☒ ORIGINAL ☐ SUPPLEMENT | **5.** CODE SECTION/DESCRIPTION 594(b)(1) PC, 405 PC, 245(c) PC X 2, 664 PC/459 PC, 664 PC/451(b) PC, 71 PC | **8.** CRIME Vandalism causing damage over $400.00 , Participating in a riot, Assault with a deadly weapon against a police officer, Attempted Burglary, Attempted Arson of an inhabited property, Threatening a University official |
|---|---|---|

**3.** PAGE 8 OF 10

| **7.** INCIDENT DATE 12-11-09 TIME 2306 | **8.** INCIDENT LOCATION University House (UC Berkeley) | **9.** ADDL. NAMES ATTACHED ☒ YES ☐ NO |
|---|---|---|

**10.** NARRATIVE

Per Officer Garlick's attached supplemental report, she approached the scene from the west on Hearst Avenue (Going eastbound on Hearst Avenue). As she approached the area, she saw several individuals slowly scattering westbound on Hearst Avenue adjacent to the north side of the University House. She stopped her car and identified herself as a Police Officer and ordered the individuals to stop by shouting, "Police Officer – Stop." The individuals kept walking and scattered in a westbound direction down Hearst Avenue. One of the suspects was wearing a black floppy felt hat that covered part of this face. He had a dark colored bandana pulled up around his nose, which was covering the bottom half of his face between his eyes and his collar. She recognized that the method he used to cover his face was similar to the methods she has seen people use to evade identification in a protest related situation involving criminal activity. As this subject tried to pass her, she placed her hand in the center of his chest and said "Stop!" He asked her if he was being detained and she advised him that he was. She placed him in handcuffs to prevent him from fleeing. She pat searched the suspect for weapons and secured him in the backseat of her police vehicle. She identified the suspect via his California Driver's License to be _____ . Per UCPD dispatch, _____ was arrested in the earlier incident at Wheeler Hall for trespassing. He was not only arrested at Wheeler Hall, he was issued a stay away from UC campus pursuant to 626.6 PC; which he had just violated. While _____ was sitting in the backseat of the patrol vehicle, he asked her if he could talk to her about it. She told him that she would talk to him at a later time. A few minutes later, _____ spontaneously stated, "I was walking with a group of people. They were chanting "Whose streets–our streets!" _____ said that the people in the group were also throwing things into the street and he was picking up after them. Per Sgt. Tucker's order, Officer Garlick advised _____ that he was being arrested. She transported him to the south side of the University House with the rest of the arrestees.

I walked up to the University House from the south steps. I could see that numerous light fixtures that lined the stairs going up to the University House had been broken. There was glass from the large bulbous glass light fixtures all over the ground. Once I got to the top of the steps, I could see a large terracotta flower pot on the base of the second fight of stairs that lead up to the front door of the University House. I also saw that a large terracotta flower pot had been knocked over on the lawn area just east of the first flight of stairs. From there, I could see a large blue garbage can with what appeared to be recyclables in and around it. The garbage can was lying on its side in front of the front door (Main entrance) of the University House. This garbage can may have been used to ram the front door. I also saw two large terracotta flower pots on the ground near the front door. One was broken into pieces and the other appeared to be mostly intact. The plants that were inside those pots were now on the lying on the ground. The large terracotta pot that was mostly intact was on the ground directly beneath the window just east of the front door. That window was shattered and it had major damage to it. The window was hit so hard with what appears to be the terracotta flower pot that it busted the wooden window frame on the inside of the house causing part of the frame to dislodge and fall to the floor inside of the house. The window just to the east of the shattered window had been hit with a glass bottle but the window itself did not shatter. There was broken glass from the glass bottle on and around the window seal.

I also saw that there was a dirty footprint on the window just west of the front door. It appeared that an unknown person kicked the window in an attempt to break it. The window that was just west of the window with the footprint on it was shattered. It is unknown what caused that window to shatter. That window was hit so hard that it caused glass to spray about five feet inside of the house all over some furniture. All of these windows are made with shatter proof glass so it would have to take a large amount of force to break these windows.

| 1. COPIES TO: ☒ DETECTIVES ☐ PATROL ☒ DISTRICT ATTY. ☐ RISK MGT. ☐ E.H&S ☐ OTHER ☐ OTHER | | | |
|---|---|---|---|
| 2. REPORTING OFFICER MANCHESTER #98 | 13. DATE AND TIME 12-12-09 / 2127 hrs. | 14. APPROVING SUPERVISOR _____ 525 | 15. DATE 12/12/09 |

| CONTINUATION REPORT | | | |
|---|---|---|---|
| 1. ☐ INCIDENT REPORT<br>☒ CRIME REPORT<br>☒ ARREST REPORT | UNIVERSITY OF CALIFORNIA<br>POLICE DEPARTMENT<br>BERKELEY<br>CA 0019700 | | 2. CASE NUMBER<br>09-05768 |
| 4. TYPE REPORT<br>☒ ORIGINAL ☐<br>SUPPLEMENT | 5. CODE SECTION/DESCRIPTION<br>594(b)(1) PC, 405 PC,<br>245(c) PC X 2, 664<br>PC/459 PC, 664<br>PC/451(b) PC, 71 PC | 6. CRIME<br>Vandalism causing damage over $400.00 ,<br>Participating in a riot, Assault with a deadly<br>weapon against a police officer, Attempted<br>Burglary, Attempted Arson of an inhabited<br>property, Threatening a University official | 3. PAGE 9 OF 10 |
| 7. INCIDENT<br><br>DATE 12-11-09 TIME 2306 | 8. INCIDENT LOCATION<br>University House (UC Berkeley) | | 9. ADDL. NAMES ATTACHED<br>☒ YES<br>☐ NO |

10. NARRATIVE

I also saw that there was a make shift torch on the ground near the front door and near the shattered window that was just east of the front door. It appeared that the torch had been thrown at the house due to the fact the makeshift wick had broken off the tip of the torch. The burnt wick portion was on the ground in front of the shattered window just east of the door. The handle portion of the torch was in front of the door. Based on the evidence, it appears to me that the lit torch was thrown at the house but nothing caught on fire due to the area being saturated by rain. It is most likely that the results of throwing a lit torched at the house would have been very different if the area was dry.

Due to the amount of the damage and the violent actions that took place during the riot, it is my opinion that the mob was attempting to gain entry into the Chancellor's home so that they could further threaten and intimidate him.

After viewing all of the damage to the University House and the property that was damaged or destroyed outside of the house, it is my opinion that it will cost approximately $5,000 to $10,000 to fix and or repair. We will be requesting an estimate of the cost of repairs to the house and the replacement of the damaged items from our Physical Plant Services department.

I went in to the house and spoke with _____ wife. She told me that she heard the chanting and noticed that it sounded close to the house. She said that she looked out the window and she saw a large group of people outside. She then heard loud banging towards the front of the house. She woke up _____ and told him what was going on and she then went down stairs to investigate. Once downstairs, she felt that the large group of people were attempting to break into the house, so she went back upstairs and told _____ what was happening and they retreated to a safe location in the home. Once they were in a safe location, they called UCPD to report what was happening. She expressed to me that it was a very scary situation for the both of them and they were in fear for their personal safety.

I gave Officer Lachler #38 my camera and had her take some photos of the damage to the south side of the University House. While she was doing that, the battery died. She was able to get some photos taken prior to the camera dying. Officer Lachler then requested an additional camera to be brought to the crime scene. Once a second camera arrived she took some additional photos. Officer Wyckoff also took the camera to the jail and took photos of suspects. Officer Wyckoff printed copies of the photos taken with both cameras (See attached photos). Officer Wyckoff then downloaded the unaltered digital photos from both cameras onto a CD and booked then CD into evidence.

Officer Torres #43 and Security Patrol Officer (SPO) Parsley #116 processed the crime scene. They took video evidence as well as digital photo evidence of the crime scene. Then they collected all of the physical evidence that was scattered around the area. There ended up being a total of seven torches that were recovered from the crime scene. There were other evidence items that were recovered from the scene (See SPO Parsley's attached supplemental report and evidence page).

The two cameras that I seized were placed into a secured locker in the detective's office. Detectives Miller #32 and Reich were given custody of the two cameras that I seized from _____ and _____ recovered from _____ 's backpack and a memory card that I recovered from _____ 's backpack

| .COPIES<br>TO: ☒ DETECTIVES ☐ PATROL | ☒ DISTRICT ATTY. ☐ RISK MGT. | ☐ E.H&S | ☐ OTHER | ☐ OTHER |
|---|---|---|---|---|
| REPORTING OFFICER<br>MANCHESTER #98 | 13. DATE AND TIME<br>12-12-09/2127 hrs. | 14. APPROVING SUPERVISOR | 528 | 15. DATE<br>12/12/09 |

**CONTINUATION REPORT**

1. ☐ INCIDENT REPORT
   ☒ CRIME REPORT
   ☒ ARREST REPORT

**UNIVERSITY OF CALIFORNIA**
**POLICE DEPARTMENT**
**BERKELEY**
**CA 0019700**

2. CASE NUMBER
09-05768

3. PAGE **10** OF **10**

| 4. TYPE REPORT | 5. CODE SECTION/DESCRIPTION | 6. CRIME |
|---|---|---|
| ☒ ORIGINAL ☐ SUPPLEMENT | 594(b)(1) PC, 405 PC, 245(c) PC X 2, 664 PC/459 PC, 664 PC/451(b) PC, 71 PC | Vandalism causing damage over $400.00 , Participating in a riot, Assault with a deadly weapon against a police officer, Attempted Burglary, Attempted Arson of an inhabited property, Threatening a University official |

7. INCIDENT
DATE 12-11-09  TIME 2306

8. INCIDENT LOCATION
University House (UC Berkeley)

9. ADDL. NAMES ATTACHED
☒ YES
☐ NO

10. NARRATIVE

All of the prisoner property was brought to UCPD where it was searched for evidence and then placed into the prisoner property holding area for safe keeping

All eight of the suspects that were detained in relation to this incident were placed under arrest for 594(b)(1) PC (Vandalism causing damage over $400.00), 405 PC (Participating in a riot), 245(c) PC X 2 (Assault with a deadly weapon against a police officer), 664 PC/459 PC (Attempted Burglary), 664 PC/451(b) PC (Attempted Arson of an inhabited property), and 71 PC (Threatening a University Official).  Due to the fact that             : had been issued a 626.6 PC stay away order earlier in the day and he violated the order by participating in this event, he was also charge with the violation of 626.6 PC.  He was the only suspect that had this additional charge.  All eight subjects were transported to the Santa Rita Jail for booking.  All of the male suspects were transported by BPD in a transport van.  The remaining female suspects were transported in two UCPD patrol vehicle that were driven by Officer's Wyckoff and Odyniec.

Officers Wyckoff and Odyniec assisted the Alameda County Sheriffs Deputies with the booking of all eight prisoners.  Per Officer Wyckoff's attached supplemental report, he read all of the suspects the Miranda Admonishment and all but             refused to talk to Officer Wyckoff about their involvement in the incident.             agreed to talk to Officer Wyckoff about the event.  In summary,             said he came to Berkeley to attend the concert at Casa Zimbabwe; that was originally supposed to be at the UC Wheeler Hall.  He said he arrived on 12-11-09 at about 2300 hours, and the concert was already over.  He said he saw what he thought was a political march forming, so he decided to follow it and document it as a journalist.  He repeatedly said he didn't know where the group was marching to or what their intentions were.             denied being involved in any criminal activity during the incident.  Officer Wyckoff questioned             regarding what he thought the group was going to do and he (             ) denied any knowledge.  When Officer Wyckoff asked             about when the group lit their torches, he (             ) got uncomfortable and said he did not think he should answer that.  Officer Wyckoff reminded             that if he were being honest and did nothing wrong, he should have no reason not to answer.             continued to get uncomfortable every time Officer Wyckoff tried to ascertain when the group became hostile.

While Officer Wyckoff was interviewing             he was writing down '             story in the form of a written statement.  When             was finished talking, Officer Wyckoff showed him what he had written and asked him to review and sign it as his written statement.             refused and said, "I didn't say I would give a written statement."  Officer Wyckoff destroyed the paper statement and told '             that would still document in his police report what he said.

Officer Wyckoff issued all of the non student affiliates a Notice of Immediate Exclusion From The University of California Berkeley pursuant to section 626.6 of the California Penal Code.  This stay away order is good for 7 calendar days.  Per Sgt. Tucker's order, the suspects that were students were issued a Notice of Immediate Exclusion From The University of California Berkeley pursuant to section 626.4 of the California Penal Code.  This stay away order is good for 14 calendar days.

I             would like to request that all subjects (Student and none students) that were involved in this case be issued a permanent stay away order from all University of California property.

Nothing further.

COPIES
TO: ☐ DETECTIVES   ☐ PATROL   ☐ DISTRICT ATTY.   ☐ RISK MGT.   ☐ E.H&S   ☐ OTHER   ☐ OTHER

| 12. REPORTING OFFICER | 13. DATE AND TIME | 14. APPROVING SUPERVISOR | 15. DATE |
|---|---|---|---|
| MANCHESTER #98 | 12-12-09 / 2127 hrs. |             525 | 12/12/09 |